[Cite as *Loewen v. Newsome*, 2018-Ohio-73.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

EDUARD LOEWEN

    Appellee

v.

PATRICIA NEWSOME

    Appellant

C.A. No.    28107

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DR-2008-11-3540

DECISION AND JOURNAL ENTRY

Dated: January 10, 2018

CALLAHAN, Judge.

{¶1} Patricia Newsome ("Mother") appeals from a judgment of the Summit County Common Pleas Court, Domestic Relations Division. This Court affirms in part and reverses in part.

I.

{¶2} Mother and Eduard Loewen ("Father") are the parents of a minor child ("Son"), who was born September 9, 2004. Mother and Father were never married to each other. Father was a German citizen at the time of Son's birth. This matter has a long procedural history.

{¶3} In 2005, Father filed an action seeking to establish his parental rights and responsibilities. According to Father, an anonymous call resulted in him being removed from the United States during the pendency of that action. Consequently, he voluntarily dismissed the action.

**{¶4}** In 2008, Father returned to the United States as a permanent resident. He then filed the action that is the subject of this appeal, again seeking to establish his parental rights and responsibilities. Ultimately, Father became a United States citizen and established a residence in Florida.

**{¶5}** A two day hearing was held in 2009, which resulted in Father being designated the residential parent and legal custodian of Son. Mother appealed and this Court reversed and remanded the matter for a new hearing due to "the trial court's unfair allocation of time between the parties at the custody hearing, which deprived Mother of an opportunity to provide her own direct testimony or to cross-examine Father." *Loewen v. Newsome*, 9th Dist. Summit Nos. 25559 and 25579, 2012-Ohio-566, ¶ 22.

**{¶6}** On remand, the trial court issued an interim order providing that, pending further hearing, Father would be the residential parent and legal custodian of Son. The court further appointed a guardian ad litem and ordered the parties to split the associated costs. In September 2012, the trial court denied Mother's oral motion to replace the guardian and to have her psychological evaluation done by a different psychologist than previously ordered. As of early March 2013, the parties had not paid the guardian's travel expenses or scheduled times for the guardian to meet with each parent and Son. The court then informed the parties that it would release the guardian if she was unable to complete her report in time for the custody hearing, which was scheduled for March 25, 2013. The court subsequently released the guardian, proceeded with the custody hearing, and designated Father the residential parent and legal custodian of Son.

**{¶7}** Mother appealed, and this Court affirmed in part and reversed in part. *Loewen v. Newsome*, 9th Dist. Summit No. 26960, 2014-Ohio-5786, ¶ 1. This Court found that the trial

court had abused its discretion in releasing the guardian ad litem. *Id.* at ¶ 31. This Court reasoned that, because Mother and Father are unable to communicate effectively, they needed more specific direction from the trial court. *Id.* at ¶ 30. In particular, the trial court

> never ordered the parties to deposit any specific sum for the guardian's travel expenses, never gave the parties a deadline by which the evaluations had to be completed, and never gave the parties notice of what, if any, consequences they might face if they failed to pay either their portions of the expenses or schedule their evaluations in a timely manner.

*Id.* Consequently, this matter was again remanded to the trial court. *Id.* at ¶ 33.

{¶8} On remand, the court appointed a new guardian ad litem ("GAL"). By order dated May 6, 2015, the court specified when the GAL would travel to Florida and when Son would travel to Ohio. The order further specified, "All interviews with [Son] in Summit County shall occur at the Common Ground Center in Tallmadge, Ohio." In addition, it set deadlines for the parties to pay the GAL's fees and travel costs, and a deadline for the GAL's report. Finally, the order stated, "The prior orders of this [c]ourt with respect to [Mother] having a psychological evaluation by Robin Tener, Ph.D., remain in full force and effect."

{¶9} The final hearing in this matter was held in October 2015. Although it was initially scheduled for two days, the trial court allowed the parties an additional day to fully present their witnesses and evidence. The court entered a judgment entry on January 7, 2016 designating Father the residential parent and legal custodian of Son, ordering Mother to pay $50 per month in child support, and granting Father the tax dependency exemption for Son.

{¶10} Mother timely appealed. On appeal, Mother filed numerous motions, including multiple motions to extend the time for filing the record and her appellate brief. Father's counsel also requested additional time to respond to Mother's motions and to file his brief. Mother raises three assignments of error.

II.

## ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT'S DECISION GRANTING [FATHER] PERMANENT LEGAL CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[,] CONTRARY TO LAW, AND/OR AN ABUSE OF DISCRETION, AND WAS NOT IN THE MINOR CHILD'S BEST INTEREST. THE TRIAL COURT ALSO ERRED IN FINDING [MOTHER] NOT CREDIBLE.

{¶11} In her first assignment of error, Mother argues that the trial court erred in finding that she was not credible and in awarding custody of Son to Father.[1] This Court disagrees.

{¶12} As an initial matter, this Court notes that, within her argument, Mother purports to challenge two provisions in the trial court's order. She quotes the trial court's determination that "Father shall be the residential parent and legal custodian of [Son]." She also quotes the trial court's determination that

> Based on Mother's refusal to obtain a psychological evaluation and her unusual behavior throughout this case, parenting time with [Son] would not be in [Son's] best interest. R.C. [] 3109.051(A). Mother shall have telephone contact with [Son] every Sunday at 7:00 p.m. Father shall place the call to Mother. [Son] shall decide the length of the call.

She argues that the trial court abused its discretion when it "reached the EXTREME conclusion to grant full residential custody to [Father] and deny any possession time with [Mother]." (Emphasis sic.)

{¶13} Mother's captioned assignment of error pertains only to custody, not parenting time. This Court has repeatedly stated that "[a]n appellant's captioned assignment of error

---

[1] In her captioned assignment of error, Mother erroneously states that the custody determination was "permanent." There is nothing in the trial court's entry indicating that its custody determination was permanent. Indeed, a court retains jurisdiction to revisit its child custody and visitation determinations. *See In re A.P.*, 9th Dist. Medina No. 13CA0083-M, 2015-Ohio-206, ¶ 14.

'provides this Court with a roadmap on appeal and directs this Court's analysis.'" *State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 41, quoting *State v. Marzolf*, 9th Dist. Summit No. 24459, 2009-Ohio-3001, ¶ 16. In addition, an appellant is required to support her arguments with citations to legal authority. App.R. 16(A)(7). The allocation of parental rights and responsibilities, i.e. custody, is governed by R.C. 3109.04; parenting time or visitation is governed by R.C. 3109.051. Mother's only citation to R.C. 3109.051 is her quote of the trial court's decision. Mother does not identify the factors contained in R.C. 3109.051, nor does she cite any legal authority applying that statute. This Court will not create an argument on her behalf. *See Cardone v. Cardone*, 9th Dist. Summit Nos. 18349, 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998).

{¶14} Turning to Mother's argument regarding custody, "the discretion which a trial court enjoys in custody matters should be accorded the utmost respect." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). A trial court's custody decision will not be overturned unless it abuses that discretion. *Stahl v. Stahl*, 9th Dist. Summit No. 27876, 2017-Ohio-4170, ¶ 4. An abuse of discretion indicates that the trial court acted in a manner that was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). This Court may not simply substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶15} When, as here, a parent also challenges the trial court's factual findings, this Court reviews those findings under a manifest weight of the evidence standard. *See Myers v. Myers*, 189 Ohio App.3d 723, 2010-Ohio-3852, ¶ 17 (9th Dist.). A manifest weight challenge addresses whether the greater amount of credible evidence supports one side over the other.

*State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When reviewing a manifest weight challenge,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). When conducting this review, an appellate court "must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21.

{¶16} When allocating parental rights and responsibilities, a trial court must consider the best interest of the child. R.C. 3109.04(B)(1). "[T]he best interest standard must be applied in initial actions to allocate parental rights in cases involving children of unmarried parents as well as in the context of divorce, dissolution, or annulment." *Anthony v. Wolfram*, 9th Dist. Lorain No. 98CA007129, 1999 Ohio App. LEXIS 4520, *5 (Sept. 29, 1999). The change in circumstances standard of R.C. 3109.04(E)(1)(a) is not applied simply because a child has resided with one parent; rather, there must be an actual prior decree awarding custody to that parent. *Id*. R.C. 3109.04(F)(1) contains the following non-exhaustive list of best-interest factors a court must consider:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶17} In its judgment entry, the trial court analyzed the facts in relation to the applicable R.C. 3109.04(F)(1) factors and designated Father the residential parent and legal custodian of Son. Mother disputes the court's findings on some, but not all, of the statutory factors. This Court limits its review to those factors that Mother's brief touches upon.

{¶18} Mother, Father, the GAL, a friend of Mother, the manager of an apartment where Mother lived with Son, and the office manager from Father's attorney's office testified at

the October 2015 hearing. Mother focuses on her testimony and that of the GAL. Because Mother challenges the weight of the evidence, this Court reviews the testimony of all the witnesses as it relates to the factors she contests. *See State v. Huguley*, 9th Dist. Summit No. 28322, 2017-Ohio-8300, ¶ 33.

{¶19} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *Miller*, 37 Ohio St.3d at 74. The trier of fact is able to observe the witnesses' demeanor, gestures, and voice inflections and use these observations in evaluating the witnesses' credibility. *Truax v. Regal*, 9th Dist. Summit No. 20902, 2002-Ohio-4867, ¶ 26. Mother acknowledges this "well established principle of law." Nonetheless she contends, "the [t]rial [c]ourt had NO basis to make a finding that Mother's testimony was NOT credible." (Emphasis sic.) Because Mother's credibility argument relates to her challenge to the trial court's findings, this Court will address these issues together.

### Relationships with Family Members

{¶20} The trial court found that "[Son] has established a solid relationship with his paternal family members. He did not have the same relationship with his maternal family members when he was with [M]other because of her estrangement from her family, except for her father." Mother does not challenge the trial court's finding that Son has a solid relationship with his paternal family members. But, she claims that she "facilitated extended relationships of [Son] with his siblings, immediate family and friends."

{¶21} Mother testified that "[her] biological mother and [her] siblings abandoned [her] and befriended the people who took [her] children." She explained that her ex-fiancé obtained custody of one of her other sons. After her ex-fiancé died, custody of that child was given to the child's paternal grandfather. She questioned Father about his interactions with that family and her mother. Father admitted that he keeps in touch with Mother's mother, who is Son's maternal grandmother. The maternal grandmother had visited Son previously and calls on special occasions. Mother testified that Father had "formed alliances" with people who were adversarial to her.

{¶22} Mother testified that she had maintained a relationship with her father and entered pictures of Son and her father's family into evidence. She also entered into evidence pictures of Son with his half-brothers and with her friends. When addressing the GAL's testimony in its judgment entry, the trial court noted that "Mother does have a positive relationship with her father and her two older children now that they are grown." The trial court's findings regarding Son's relationships with various family members are supported by the evidence.

### Adjustment to Home, School, and Community

{¶23} The trial court found, "[Son] is well adjusted to his present home, school, and community. He is doing well in school, attends church and is involved in sports and other activities outside of school. When he was with his mother, he was relatively isolated." Mother does not deny that Son has been involved with various activities since residing with Father. She contends, however, that the GAL "largely ignored" the high number of school absences and tardies Son had when he moved to Florida. She further contends that she had frequent outings with Son when he lived with her.

{¶24} Son moved to Florida with Father when he was 5 years old. Father testified that he had not attended preschool while living with Mother. Father enrolled him in school. Evidence was presented that Son was absent 26 days and tardy 38 days in first grade. Father explained that he was adjusting to being a single parent and traveled for work. Father testified that he currently has people who help with Son when he travels for work. He further testified that Son gets A's and B's in school. Father also entered into evidence letters from Son's principal and some of his teachers and a certificate indicating that Son was on the honor roll. The GAL visited Son's current school and confirmed that he was doing well in school. The GAL testified that Son is "very happy [and] well adjusted." She further testified that Son seemed concerned that, if he had to move to Ohio, he might lose all his friends.

{¶25} Mother testified that she would take Son on outings, but because he had sensory dysregulation "the best thing to do was to go to the same places so he was familiar with them." She also testified that she would take his friends with them and introduced pictures of Son with his friends into evidence. The apartment manager testified that she "would see [Son] outside playing from time to time, but really not that much." When Mother testified, she criticized Father's use of the apartment manager as a witness because, according to Mother, the apartment manager is "completely wacko." The trial court was in the best position to evaluate the credibility of these witnesses. In addition, to the extent that Son's activities many years prior to the hearing date were relevant, the trial court did not find Son was completely isolated, but only "relatively" so.

Mental and Physical Health

{¶26} The trial court found:

Father has no mental or physical health problems. Mother has physical and mental health issues according to her testimony and the information provided by

the [GAL] from Mother's therapists. The [trial c]ourt is also concerned about Mother's refusal to comply with this [c]ourt's long standing order that she be evaluated by Dr. Robin Tener.

Mother does not dispute the trial court's findings that Father has no mental or physical health problems, nor does she dispute that she has physical health problems. Her arguments concern the trial court's findings regarding her mental health.

{¶27} Mother argues that she was evaluated by Dr. Judie Shields who reported in March 2013 that she was "'fully capable of providing a stable home life for [Son].'" She criticizes Father for not "secur[ing] a professional or medical witness" who had examined her. She claims that the trial court "ignored" testimony that she had been in counseling since 2007. She continues that this, "coupled with [her] long standing career in child care, demonstrates her value in the ability to care for a child." Mother further contends "[t]here was NO evidence presented at all concerning any concerns with [Mother] caring for her own children or providing care in the family homes." (Emphasis sic.)

{¶28} Early on in this case, the parties were ordered to submit to a psychological evaluation and Dr. Tener was selected as the evaluator. In May 2009, Dr. Tener wrote a letter stating that Father had completed his portion of the assessment, but she had not heard from Mother. Dr. Tener further stated, "I cannot provide any recommendations regarding custody unless I have the opportunity to evaluate both parents." In its September 12, 2012 entry denying Mother's motion to use a different psychologist, the trial court noted that the "[b]est practice is for both parents to be evaluated by the same psychologist." In a November 21, 2012 entry, the trial court reiterated that Mother was to have an evaluation with Dr. Tener, who had already evaluated Father. Following this Court's last remand, the trial court reminded Mother that its "prior orders" to have a psychological evaluation by Dr. Tener "remain[ed] in full force and

effect." Mother has not explained how her failure to be evaluated by Dr. Tener is not in violation of the trial court's repeated orders or how her evaluation by a different psychologist can substitute for an evaluation of both parents by the same psychologist, nor has she explained why Father would be responsible for her failure to comply with the court's orders.

{¶29} Regarding her other arguments, the GAL spoke with the mental health professionals who had treated Mother and learned that Mother was diagnosed with PTSD based on events that occurred when she was a child or young adult, but was "making progress." Mother testified that she had worked in child care and introduced pictures of some of the children she had cared for into evidence. Although Father claims in his brief that Mother "never divulged any employers or work history to support" her work claims, Mother did submit her resume into evidence. But, it is also true that Mother testified that her work was "sporadic." Mother testified on direct that she was "never found unfit" to care for her child who was raised by her ex-fiancé and the child's paternal grandfather. She claimed that Father was "conniving" and "manipulating" and that "he was going to get someone to find [her] unfit to be [Son's] mother and take [Son] just the way they took [her other child.]" When Father's attorney attempted to cross-examine her regarding the case involving the other child, Mother refused to answer her questions.

{¶30} This Court notes that Mother's arguments here focus on whether she was "capable" of caring for Son. That is not the appropriate standard; rather, the standard is what was in the "best interest" of Son. *See* R.C. 3109.04(B)(1), (F)(1). Mother has not demonstrated that the trial court failed to consider the evidence and apply the correct standard.

{¶31} The trial court also found that Son had multiple health diagnoses when he lived with Mother, but since moving with Father "he is a happy, healthy, active child." Mother asserts

that "[Son] is diagnosed with sensory d[y]sregulation, and ADHD" and "requires specialized care." She further states that Father refused to acknowledge or provide support for Son's special needs.

{¶32} Mother testified to her many health concerns for Son. Father "concede[d] that [Son] had some behavioral problems" initially. Although he could not remember exactly when, Father remembered talking to Son's doctors and other professionals involved in Son's care while he resided with Mother. But, Father did not believe that Son was a special needs or disabled child. According to Father, in the six years since Son began residing with him, not one school official or professional had identified Son as special needs. Father testified that Son was "healthy" and "thriving." The GAL corroborated Father's testimony. The GAL testified that Son appeared to be in good health when she met with him. She also visited his school and spoke with his teachers. The information she received from the school did not identify Son as special needs.

{¶33} The testimony of Mother's friend was largely consistent with Mother's testimony regarding Son's early health issues. She testified that she is a registered nurse and a pediatric nurse practitioner. She has worked with children with chronic health issues and developmental needs for 37 years. She testified that, when Son resided with Mother, there were some concerns with Son because of his "environmental sensitivities." She explained that "sensory dysregulation is often misinterpreted as ADHD" and "in a young child it's hard to tell early on where the attentional issues aren't as focused as say like in a school setting." She further explained that with "early intervention services at a young age" sensory dysregulation may become "more normalized," but "ADHD is chronic and pervasive." She was not surprised to hear that Son is currently doing well in school. Although Mother continues to speak of these diagnoses in the

present tense, the evidence supports the trial court's finding that Son currently exhibits no indication that "[s]ensory [i]ntegration" or ADHD issues are impacting his schooling or home life.

Honoring Parenting Time

{¶34} The trial court found, "Both parents have created problems for the other in maintaining contact with [Son]" and "Mother continuously and willfully denied Father his parenting time when [Son] was with her." Mother states that "[e]vidence was presented to demonstrate that Father did visit with [Son] at Mother's home." She argues, based on that fact, that the trial court "improperly found that Mother denied visits with Father and that she failed to follow court orders."

{¶35} In its judgment entry, the trial court acknowledged that "Mother did allow Father to visit [Son] at her home," but noted that "the visits were contentious and the police were frequently called." This is consistent with the testimony that was presented.

{¶36} Father testified that he came to the hospital after Son was born and, then, stayed with Mother and Son at their residence because Mother had some health issues after the birth. At some point, there was a discussion with some friends of Mother wherein it was suggested that Father take Son to Germany until Mother was "back on her feet." At that point, Mother removed him from any contact with Son and the police were called. According to Father, he then returned to Germany "because I could not see my son anymore." When he came back, she allowed him to visit Son, but it was "always exactly on [her] terms" and "very controlled."

{¶37} Around that time, Father filed his first parentage action. After Father was granted supervised visits with Son, Mother sent him an email stating, "I am not sure what is driving you to push forward with any court involvement when I have always welcomed you to be a part of

our lives with no restraints." She concluded, "I cannot see that having court ordered restrictions on your time with [Son] and involvement by more professionals is of any benefit to anyone." In her testimony, Mother explained the email was not meant to refuse visitation, but that she would abide by the court order for limited visitation although she "thought it was better for [Son] to see [Father] in [Son's] house instead of in a stuffy room."

{¶38} Father presented correspondence from his attorney and orders from the 2005 case regarding visitation. The trial court in the present case noted that, because Mother had refused to cooperate with an order from June 2005 to arrange supervised visitation, the magistrate issued another order in November 2005. That entry states, "[Mother] shall comply with the order that the supervised visits take place at Family Visitation and Mediation Services." (Emphasis sic.) In an April 2006 order, the magistrate again addressed the outstanding visitation issues.

{¶39} In the present case, Father was granted unsupervised visitation with Son in Ohio beginning in March 2009. He testified that visitation would be scheduled and he would arrange his flights to Ohio, but there were "always last minute changes" by Mother. He further testified that "almost every visit" ended up in a conflict and the police were frequently called.

{¶40} Mother testified that she gave Father "more time than he was allowed," but "he created a ruckus every time." She testified that Father would call the police, but that she had also called the police at times. She further testified that "[t]he interferences that caused [Father's] visits to be shorter were his own doing." She described an instance where Father showed up an hour late. According to Mother, her attorney advised her if he showed up late she did not have to give Son to him. After the police arrived, however, Mother "ask[ed] her attorney again" and permitted the visit to go forward.

**{¶41}** Both parties testified to an incident after Father received custody of Son. It was ordered that Mother would have summer parenting time from July 15, to August 16, 2010. It was further ordered that, during that time, Father would have telephone contact with Son twice a week and Skype contact twice a week "for as long as [Son] is inclined to talk." Father testified that Mother only permitted him "maybe one, maximum two phone calls" with Son. According to Mother, Son did not want to talk with Father. At the end of that visit, Mother sent Father an email indicating that Son did not wish to return to Florida with him. The parties changed their pick-up location from Mother's residence to the Stow Police Station. The transition did not go smoothly, and Father was charged with domestic violence against Son. Following a bench trial, Father was acquitted of the charges. The trial court in the present matter found that, to the extent the incident remained relevant five years after Father was acquitted, the relevance was Mother's "inappropriate behavior" in not facilitating the transfer of Son back to Father.

**{¶42}** The GAL's report documents her communications with Mother. Although the trial court ordered that the GAL's interviews with Son would occur at Common Ground Center, Mother repeatedly expressed her desire for the visit to occur at her home. For instance, in an email the day before the scheduled visit, Mother states, "We are to be meeting at Common Grounds this weekend and in their contract it says that they are willing to travel to the parent's home. * * * I am asking again at this last minute now if you can advocate for [Son] and I so we can have a comfortable and normal visit at our home so you can make a fair and equal assessment." After the GAL responded that she "cannot change the court order[,]" Mother responded that she was not asking the GAL to change the order but that she "hoped that [the GAL] could advocate with the [j]udge on [Son's] behalf so that [Son] could be comfortable during [their] first visit in so long."

**{¶43}** Based on the evidence presented, this Court cannot say that the trial court erred in its findings regarding the parties' facilitation of and compliance with court-ordered parenting time.

Physical Abuse

**{¶44}** The trial court found, "Neither parent has abused [Son]." In Mother's brief she relates the incident involving Father's arrest for domestic violence when he attempted to pick up Son following her parenting time with him in the summer of 2010. She further argues that she "testified that Father has been and continues to be physically abusive to [Son]."

**{¶45}** In regard to the domestic violence arrest, even Mother acknowledges that "Father was found [n]ot [g]uilty." As to Mother's allegations that Father was physically abusive against Son, Mother testified that she was concerned about Son during the 2010 visit so she took him to a counselor. A letter from the counselor states that Son wanted to kill Father because he hits him. Father testified that social services in both Florida and Ohio investigated, but that there was nothing to support the accusations against him. The GAL was not able to obtain information from Florida Children Services, but did obtain information from Summit County Children Services. Summit County Children Services was "not able to find a substantiated abuse or neglect case." The GAL also spoke with Son who stated that he is physically disciplined on occasion, but most often his punishment is an activity restriction. The GAL testified that she did not believe Son was physically abused.

**{¶46}** The GAL expressed concern about some of Mother's interactions with Son during her supervised visit in September 2015. She testified that Mother whispered something to Son and, when she asked Son, he told her that Mother had asked "if his father was still hitting him." Mother testified that her visit was observed by a Common Ground employee, and she was not

"sneaky" and "did not whisper anything in [Son's] ear." She confirmed that she asked, "is [F]ather still hitting you?" She continued that she also told Son, if anybody ever hurts him, he is to tell his teachers. She explained that she did this because it is "[her] duty as his mother to protect him." Based on the evidence presented, this Court cannot conclude that the trial court erred in finding Son had not been abused.

### Additional Factors

**{¶47}** R.C. 3109.04(F)(1) directs that "the court shall consider all relevant factors, including but not limited to[,]" the listed factors. Because this is a non-exhaustive list, the court may consider additional relevant factors. In her brief, Mother mentions some additional factors.

**{¶48}** Mother claims "no weight was given to the fact [that] Mother had primary custody of [Son] for nearly five (5) years of his life, prior to the decision to allow [Son] to relocate to Florida with Father." In support of this claim, Mother cites *In re D.M.*, 196 Ohio App.3d 50, 2011-Ohio-3918 (12th Dist.). According to Mother, *In re D.M.* reversed a decision granting custody to a father when the mother had been the primary caregiver of a child since his birth. *In re D.M.* actually reversed a decision granting custody to the mother. The court stated, "Upon a thorough review of the record, we find that the juvenile court abused its discretion in granting custody of D.M. to *[m]other*." (Emphasis added.) *Id*. at ¶ 28. The court continued that it was "mindful that [the m]other has been the primary caregiver of the child since he was born." *Id.* at ¶ 29. The court recognized that this role may be a "'relevant factor when determining the best interest of a child,'" but found "'[t]his factor * * * is not given presumptive weight over other relevant factors.'" *Id.* at ¶ 29, quoting *Terry L. v. Eva E.*, 12th Dist. Madison No. CA2006-05-019, 2007-Ohio-916, ¶ 17.

{¶49}  In the present case, Son resided with Mother from his birth until December 2009. He resided with Father from December 2009 until the present.  At the time of the hearing in October 2015, each parent had been Son's primary caregiver for half of his life.  Therefore, even had the trial court considered this factor, it would appear, at best, to weigh equally between the parties.

{¶50}  Mother also claims she "has never been arrested for any criminal activity and has no history, past or present, of any drug or alcohol abuse."  Mother does not explain how this factor should have weighed in the court's analysis.  The court's entry is silent as to whether Mother did or did not have a criminal or substance abuse history.  Nonetheless, because Mother raises the issue, this Court notes that her claim is belied by the record, as the "Family Abstract" states that Mother was arrested in 2002 on a "Disorderly and Intoxicated charge."

{¶51}  Father notes in his brief that Mother's "odd behavior during [the] court proceedings" included a claim that she was represented by Father's attorney while she was in the hospital after giving birth to Son.  This claim necessitated Father calling his attorney's office manager as a rebuttal witness.  The office manager testified that Father's attorney had not represented Mother.

Conclusion

{¶52}  Having reviewed the record, this Court cannot say that this is the exceptional case where the trial court lost its way or abused its discretion in awarding custody to Father.  The trial court was in the best position to evaluate the credibility of the witnesses.  Mother's first assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 2**

THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING [MOTHER] TO PAY A CHILD SUPPORT OBLIGATION WITH NO EVIDENCE TO SUPPORT IT OR CHILD SUPPORT GUIDELINES ATTACHED TO THE DECISION.

**{¶53}** In her second assignment of error, Mother argues that "the [t]rial [c]ourt erred and abused its discretion in [1] not securing any evidence concerning the gross incomes of either party, [2] allocating an arbitrary minimum child support order upon [Mother,] and [3] failing to [complete and] attach child support guidelines to the [j]udgment [e]ntry." This Court disagrees with Mother's first and second arguments, but agrees in part with her third argument.

Income Evidence

**{¶54}** First, Mother contends that the trial court had no evidence of the income of either party because "no financial information or income figures were presented." Factually, this allegation is incorrect. Father testified as to his income and entered a copy of his income tax return from the prior year into evidence.

**{¶55}** With respect to Mother, the trial court received partial information. Mother testified that she babysits and her "earning[s were sporadic,]" but that she made "[m]aybe a little bit under [$]800" per month at her last job. She further testified that she could "get up to [$]10 to [$]12 to $13 an hour for babysitting." When asked how much she earned the year prior to the trial, Mother responded, "In 2014[,] I couldn't tell you." When asked if she recalled how much she earned the year of the trial, Mother responded, "No, I don't." When asked if she could give a "rough estimate[,]" she stated, "No, I can't." She provided the identical, "No, I can't[,]" answer to questions about her earnings for 2011, 2012, and 2013. Thus, any failure by the trial court to obtain complete information regarding Mother's income was invited by her.

Minimum Child Support Order

**{¶56}** Mother next contends that the trial court "arbitrarily" imposed a minimum child support obligation on her. The trial court stated that it set Mother's obligation "at the statutory minimum of $50.00 per month" and cited R.C. 3119.06. R.C. 3119.06 provides that, unless an exception applies, "the court shall issue a minimum child support order requiring the obligor to pay a minimum of fifty dollars per month." Mother did not argue that any exception applied. This Court cannot find that the trial court acted "arbitrarily" in following the statute.

Child Support Worksheet

**{¶57}** Finally, Mother argues that the trial court erred by failing to complete a child support worksheet and attach it to its judgment entry.

**{¶58}** "It is well settled that, in issuing an order for child support, a child support worksheet must be completed and made a part of the record." *In re M.O.*, 9th Dist. Summit Nos. 28351, 28371, 28383, 2017-Ohio-7691, ¶ 11, citing *Marker v. Grimm*, 65 Ohio St.3d 139 (1992), paragraph one of the syllabus. *See also Smith v. McLaughlin*, 9th Dist. Summit No. 24890, 2010-Ohio-2739, ¶ 17 (current statute contains same language as that analyzed in *Marker*). This Court has previously found the failure to attach a child support worksheet to the final judgment entry was not fatal where it was attached to a magistrate's decision. *See In re M.O.* at ¶ 11, *Smith* at ¶ 18. In the present case, however, the record contains no child support worksheet.

**{¶59}** Father acknowledges that R.C. 3119.022 mandates that the court utilize the child support worksheet when it "calculates" a child support obligation, but argues that no worksheet was required in this case because the court set the obligation at the statutory minimum and "did not calculate child support." This argument overlooks that a trial court is statutorily required to calculate the child support obligation. When ordering child support, "the court or agency *shall*

*calculate* the amount of the obligor's child support obligation in accordance with the basic child support schedule [and] the applicable worksheet * * *." (Emphasis added.) R.C. 3119.02. Father has not pointed to any authority relieving a trial court of this statutory obligation.

{¶60} Thus, this matter must be remanded for the trial court to calculate child support, including completing the applicable worksheet which must then be placed in the record. Mother's second assignment of error is sustained in part.

## ASSIGNMENT OF ERROR NO. 3

> THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE TAX EXEMPTION TO [FATHER] EACH AND EVERY YEAR.

{¶61} In her third assignment of error, Mother argues that the trial court failed to properly apply R.C. 3119.82 when allocating the dependent child tax exemption solely to Father. This Court disagrees.

{¶62} R.C. 3119.82 provides:

> Whenever a court issues, or whenever it modifies, reviews, or otherwise reconsiders a court child support order, it shall designate which parent may claim the children who are the subject of the court child support order as dependents for federal income tax purposes as set forth in section 151 of the "Internal Revenue Code of 1986," 100 Stat. 2085, 26 U.S.C. 1, as amended. If the parties agree on which parent should claim the children as dependents, the court shall designate that parent as the parent who may claim the children. If the parties do not agree, the court, in its order, may permit the parent who is not the residential parent and legal custodian to claim the children as dependents for federal income tax purposes only if the court determines that this furthers the best interest of the children and, with respect to orders the court modifies, reviews, or reconsiders, the payments for child support are substantially current as ordered by the court for the year in which the children will be claimed as dependents. In cases in which the parties do not agree which parent may claim the children as dependents, the court shall consider, in making its determination, any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children.

This Court reviews a trial court's allocation of a dependent child tax exemption under an abuse of discretion standard. *Batcher v. Pierce*, 9th Dist. Summit Nos. 27415, 27497, 2015-Ohio-2130, ¶ 9.

{¶63} Mother contends that "the [t]rial [c]ourt had NO evidence whatsoever, presented by either party of the gross income of either party" and, therefore, the court "exceed[ed] its discretion in simply awarding the exemption to Father." (Emphasis sic.) As noted under Mother's second assignment of error, Mother's factual assertion is incorrect. Father testified to his income and submitted his tax return into evidence. Only Mother failed to provide this information. Although she stated that she files tax returns, she did not bring any with her to the hearing and did not provide the total amount of her income for any of the prior four years or even a "rough estimate" for the current year.

{¶64} In addition, Mother ignores the parties' burdens regarding the exemption. While R.C. 3119.82 requires that the court designate which party receives the tax exemption, "[u]nless the issue is raised by the parties, the trial court is not required to engage in *any* analysis under the statute unless it chooses to award the tax exemption to the non-residential parent." (Emphasis sic.) *Fisher v. Fisher*, 3d Dist. Henry No. 7-05-03, 2005-Ohio-5615, ¶ 25. "When there is a sole parenting situation, there is a presumption that the trial court should allocate the dependency exemption to the residential parent." *Batcher* at ¶ 10. The non-residential parent bears the burden to provide any information needed to overcome this presumption. *Geschke v. Geschke*, 9th Dist. Medina Nos. 3266-M, 3268-M, 2002-Ohio-5426, ¶ 32.

{¶65} In the present case, neither party raised the allocation of the dependent child tax exemption as an issue at the hearing. Thus, the trial court was entitled to rely on the presumption that the exemption be allocated to Father as the residential parent. Mother did not present any

evidence to overcome this presumption. *See Stahl*, 2017-Ohio-4170, at ¶ 24 (upholding presumption that dependency exemption belongs to the residential parent where non-residential parent failed to present evidence of net tax savings if awarded exemption). Consequently, the trial court did not abuse its discretion in awarding the exemption to Father.

**{¶66}** Mother's third assignment of error is overruled.

### III.

**{¶67}** Mother's first and third assignments of error are overruled. Her second assignment of error is sustained in part. The judgment of the Summit County Common Pleas Court, Domestic Relations Division, is affirmed in part and reversed in part. This matter is remanded for the limited purpose of calculating the child support obligation including the appropriate worksheet.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

LYNNE S. CALLAHAN
FOR THE COURT


HENSAL, P. J.
SCHAFER, J.
CONCUR.


APPEARANCES:

KENNETH J. LEWIS, Attorney at Law, for Appellant.

LESLIE A. WEISS and WILLIAM S. HALBERG, Attorneys at Law, for Appellee.