[Cite as *Ash-Holloway v. Holloway*, 2022-Ohio-4248.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| KAREEM ASH-HOLLOWAY, | CASE NO. 2021-T-0031 |
| Plaintiff-Appellee, | |
| - vs - | Civil Appeal from the Court of Common Pleas, Domestic Relations Division |
| WAYNE D. HOLLOWAY, | |
| Defendant-Appellant. | Trial Court No. 2018 DR 00342 |

**O P I N I O N**

Decided: November 28, 2022
Judgment: Affirmed

*David L. Engler,* Engler Law Firm, 181 Elm Road, N.E., Warren, OH 44483 (For Plaintiff-Appellee).

*Michael A. Partlow,* 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

*Sherman J. Miles,* P.O. Box 606, Campbell, OH 44405 (Guardian ad litem) and *Bruce M. Broyles,* 1379 Standing Stone Way, Lancaster, OH 43130 (Co-counsel).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Wayne D. Holloway ("father"), appeals from the decree of divorce, entered by the Trumbull County Court of Common Pleas, Domestic Relations Division. There are various issues before the court on appeal, including the trial court's custody order, its decision to permit the guardian ad litem ("GAL") to remain on the case and its reliance on his testimony; its spousal support award; its purported limitation of testimony by the attorney appointed for the parties' child; and its decision permitting

appellee, Kareem Ash-Holloway ("mother"), to remain in the marital residence during the pendency of its sale. We affirm.

{¶2} On December 6, 2018, mother filed her complaint for divorce, custody, child support, spousal support, and property rights. Father subsequently filed his answer, counterclaim for divorce, and motion for temporary orders. A guardian ad litem was appointed for the parties' child, W.H. And, later, an attorney was appointed to represent W.H. During the pendency of the case, father, who was unemployed, had temporary custody of W.H. and remained in the marital home. Mother, who was employed full-time, paid the mortgage on the marital home as well as the utilities and medical insurance for both W.H. and father. The matter proceeded to trial and the trial court issued its divorce decree. Father now appeals, assigning six errors. His first asserts:

{¶3} "The trial court's finding that appellee should be established as residential parent of the child is against the manifest weight of the evidence and constitutes an abuse of discretion."

{¶4} Father contends that the trial court erred in naming mother residential parent. He asserts that because he was the primary caretaker of W.H. during the pendency of the proceedings, the trial court essentially modified a prior custody order, and in doing so, failed to engage in the full statutory analysis required for a custody modification. Appellant's attempt to analogize the court's order to a modification of an existing order is improper.

{¶5} This court has previously addressed the argument appellant advances. In *Williams v. Williams*, 11th Dist. Trumbull No. 2002-T-0101, 2004-Ohio-3992, a mother was granted sole custody of the parties' child. Later, she moved to relocate to Texas with

2

the child.  The trial court granted the motion but replaced the former sole-custody order with a temporary-custody order. Later, after the trial court transferred the case to Texas, it revised the existing temporary-custody order to a sole-custody order.  On appeal, the father argued, in part, that R.C. 3109.04(E)(1)(a), which sets forth the elements for modifying an existing parenting plan, controlled a trial court's analysis.  This court determined that that statute was inapplicable to the case.  To wit:

{¶6}    Although there was a prior order of custody in this case, it was merely a temporary order. "When a court makes its permanent custody order, differences between it and the temporary order are not modifications pursuant to R.C. 3109.04(B)(1) [the precursor to R.C. 3109.04(E)(1)([a])]." *Rowles v. Rowles* (Apr. 29, 1988), 11th Dist. [Lake] No. 12-064, [1988 WL 41553], at 5-6. "It is only after the final judgment allocating parental rights and responsibilities that the court must comply with the statutory requirements for modification." *Boling v. Valecko,* 9th Dist. Summit No. 20464, 2002-Ohio-449, ¶11.  In effect, when a court modifies a temporary custody order, a court need only apply the best interest standard. *Id.  Williams*, *supra*, at ¶27.

{¶7}    Here, as in *Williams*, the existing custody order which was in effect during the pendency of the divorce proceeding was temporary.  The court issued its final custody order in the underlying divorce decree.  Because there was no modification of a final custody order, R.C. 3109.04(E)(1)(a) is inapplicable.  We must consequently determine whether the trial court abused its discretion in concluding W.H.'s best interests were served by granting mother residential-parent status.  *See* R.C. 3109.04(B)(1) ("When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding * * *, the court shall take into account that which would be in the best interest of the children.")  "'[T]he best interest standard must be applied in initial actions to allocate parental rights in cases involving children of unmarried parents as well as in the context of divorce, dissolution, or

3

annulment.'"  *Loewen v. Newsome*, 9th Dist. Summit No. 28107, 2018-Ohio-73, ¶16; quoting *Anthony v. Wolfram*, 9th Dist. Lorain No. 98CA007129, 1999 WL 771601, *2 (Sept. 29, 1999).

{¶8}   With this in mind, we must consider whether the trial court's judgment was in W.H.'s best interest.  Initially, father appears to assert this court must review a custody determination using a manifest-weight-of-the-evidence standard.  Father, however, only cites civil cases (and some criminal cases), unrelated to domestic relations and/or divorce proceedings, for his position. This court, as well as the Supreme Court of Ohio, has held that decisions involving the custody of children are within the discretion of the trial court and accorded great deference on review.  *Wren v. Tutolo,* 11th Dist. Geauga No. 2012-G-3104, 2013-Ohio-995, ¶8; *see, also, Bates–Brown v. Brown,* 11th Dist. Trumbull No. 2006-T-0089, 2007-Ohio-5203, ¶18, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).  Thus, any judgment of the trial court involving the allocation of parental rights and responsibilities will not be disturbed absent a showing of an abuse of discretion.  *Id.*, citing *Davis v. Flickinger,* 77 Ohio St.3d 415, 418 (1997).

{¶9}   The phrase "abuse of discretion" is one of art, connoting judgment exercised by a court, which does not comport with reason or the record. *Gaul v. Gaul*, 11th Dist. Ashtabula No. 2009-A-0011, 2010-Ohio-2156, ¶24. "In determining whether the trial court has abused its discretion, a reviewing court is not to weigh the evidence, but, rather, must determine from the record whether there is some competent, credible evidence to sustain the findings of the trial court." *Lucas v. Byers*, 11th Dist. Lake Nos. 2020-L-010, 2020-L-049, and 2020-L-050, 2021-Ohio-246, ¶6, citing *Clyborn v. Clyborn,* 93 Ohio App.3d 192, 196 (3d Dist.1994).

Case No. 2021-T-0031

{¶10} Father claims that the trial court gave "absolutely no consideration to how change of [W.H's custody] would impact the child. Nor did the trial court even consider the testimony of its own expert[, Dr. Aimee Thomas] with regard to treatment for the mother and the impact that the change would have upon the child." Further, father asserts the trial court's reliance upon the GAL's testimony, which included hearsay testimony from other mental health professionals, was not only problematic, but plain error. We do not agree.

{¶11} Initially, mother testified that she has remained employed, full-time, throughout the marriage. It is undisputed father has been unemployed since 2012 and functioning, by his testimony, as a stay-at-home dad. In July 2019, however, mother reported an incident in which she was threatened by father which caused her to contact police. Although she filed a criminal complaint due to father's alleged hostile and physically threatening behavior, she was removed from the marital home. According to mother, father, in the course of that case, informed the court that: (1) mother did not have a relationship with W.H. and (2) father had been appointed custodian of W.H. These points, as well as the full circumstances of mother's removal from (or her voluntary decision not to remain in) the marital home are unclear. Regardless, it is uncontroverted that mother continued to pay the mortgage and utilities for the home. She also paid for father's and W.H.'s health care. An order was ultimately entered in August of 2019 which granted father custody of the child and granted mother standard visitation.

{¶12} Mother testified that she had previously filed for divorce in March 2017. This filing occurred after a separate incident in which, according to mother, father became extremely agitated that mother declined to allow him to intern at the mental health clinic

5

she supervised. She apparently explained that father would have to obtain various background clearances, but he disagreed and felt these procedures would be unnecessary. He became upset and allegedly yelled at mother for some three hours, frequently with his fists clenched. Mother noticed W.H. was crying due to the commotion. She ultimately left the home and reported the incident to the Liberty Police Department. Mother asserted she was concerned about father's behavior and the status of W.H. Mother, with police, arrived at the house where she granted police access. When father became uncooperative and refused to retrieve W.H. to show he was unharmed, police tased father. After this incident, the couple reconciled; later, however, due to their inability to coexist effectively, mother filed the instant action.

{¶13} According to mother, once she was removed from/left the marital residence, W.H. became increasingly irritated with her. He continually claimed she did not care about him and routinely asserted that mother had father tased. W.H.'s recalcitrance toward mother culminated in his statement that he never wanted to see or be around her again. Mother maintained that, prior to the second divorce filing, she and W.H. had a normal, loving relationship. Mother underscored that W.H.'s framework for understanding the tasing incident dramatically changed after the second filing. In short, rather than viewing the incident as a matter which father could have avoided, W.H. consistently blamed mother for having father tased.

{¶14} Further, according to mother, after the second filing, father failed to regularly facilitate visitation; and he additionally made allegations that mother physically abused W.H., either by choking the child or not feeding him. With respect to the latter point, father called the police. When they arrived, mother allowed the police to view her

6

refrigerator, which was fully stocked with food; moreover, father later contacted children's services, claiming mother was not feeding W.H. Children's services found the allegation unfounded.

{¶15} According to mother, since the second divorce filing, she believes father has engaged in an aggressive attempt to alienate W.H. from her. Father vehemently denied this and alleged mother created the circumstances which caused W.H. to adopt a hostile perspective. Still, mother testified:

{¶16} "[T]he father is just at this point trying to completely manipulate, sabotage. He's so enmeshed. He's just trying to erase me from my son's life all together. So, * * * I need my son alone so that I can reclaim that relationship that I always had with him without the interference of the father because the father is not going to discontinue interfering. He has constantly interfered and it's not gonna stop."

{¶17} When asked what she meant by her use of the term "enmeshed," she stated: "Enmesh means that he's become one with our son. Like, it's just like they're tied at the hip." Mother feared that if she was not granted status as residential parent, she would lose her relationship with W.H. She also was concerned that father's consistent flouting of her visitation rights showed an open disregard not only to her interests, but the authority of the court. Mother's testimony indicated her belief that father's actions will eventually have a deleterious effect on W.H.'s growth because it, in effect, inculcates disrespect and irresponsibility.

{¶18} Dr. Aimee Thomas, a clinical psychologist who assessed the parties' parenting strategies and mental health testified at the final hearing. With respect to father, she noted that W.H.'s preferences and interests reflect an allegiance to father. She

7

observed that this is not extraordinary because of W.H.'s age.  Further, father's role as primary caregiver as well as father's extremely active role in W.H.'s activities and day-to-day routines also contribute to W.H.'s parental preference.  Dr. Thomas observed that W.H.'s reaction and processing of the tasing incident was a function of his allegiance to father which also functioned to justify father's perceived victimization.

{¶19}  Dr. Thomas testified that father doted on W.H., raising him to be "a million dollar man."  She asserted that the relationship between W.H. and father indicated the latter was attempting to live indirectly through the child, "seeing the boy as an opportunity for him to relive things that he, perhaps, couldn't fulfill in his own childhood."  While the heightened attention may be a sign of affection, the doctor pointed out that inhibits a child's ability to become an individual, make his own decisions, and develop interests independent of the parent.  In this respect, she observed that, in her conversations with W.H., it was clear he did not want to "take the lead" in making personal decisions.  She testified:

{¶20}  "Dad identified himself as a person who is a nutritionist, a personal trainer, the coach, and Dad becomes the end all be all and is kind of put on this pedestal.  At a certain point, I think that bubble is going to burst when [W.H.] is in adolescence or does go off to college, he's going to look at things differently.  On one hand, it's great when a kid looks up to a parent as a good role model, but when there's problems with understanding what you want versus what your parent wants and not being able to separate those two things, that's where it's not healthy for a child."

{¶21}  Dr. Thomas reported that, in light of the relationship that father has formed with W.H., it is possible that the child will rebel against father's restrictions on diet and

8

activities as he evolves and matures. The doctor opined that even though father may meet W.H.'s needs for love and attention, he may be exploiting the relationship by focusing on his need to live indirectly through W.H. Dr. Thomas observed that "[w]hen a child's goals and desires become intertwined with the goals and desires of the parent, the child's identity and emotional development may become stunted." She asserted that father lacks insight into this ostensible dysfunction and, during her interviews with him, father was unable to accept feedback that contradicts his personal narrative. Dr. Thomas recommended that mother become more involved in W.H.'s life and, in doing so, not treat his behaviors as defiance, but as emotional problems. She additionally observed that it is critical that mother be involved in W.H.'s mental health treatment and that treatment providers become aware of the challenging aspects of father's personality and the character of the relationship he has created with the child.

{¶22} In addition to the foregoing, Dr. Thomas pointed out father exhibited signs of ADHD to the extent, during her interviews, he had difficulty remaining consistent and coherent in his presentation of information. And she stated that father's focus is centralized on himself and his past; to wit: "becoming homecoming king, his GPA, he spent a lot of time really kind of tallying himself and bragging about his accomplishments. And it was curious that even when I asked him, what do you like best about his son, he then went into what he liked best about himself. And so there was almost kind of a confusion over the separation between himself when [sic] he does and his child. * * * I think underlying that narcissism is actually a very fragile ego, but it comes across as very, like a braggart."

9

{¶23} When asked by the court about mother, Dr. Thomas confirmed that she utilized a more "authoritarian" parenting style. Although this is not inherently problematic, Dr. Thomas' testimony indicated that it could undermine attempts to build a relationship with W.H. The doctor underscored this could be changed with some insight into parenting methodology, but it is additionally difficult when the child is being influenced, potentially negatively, by the other parent. Dr. Thomas also pointed out that adjustment can be difficult where a child, like W.H. feels as though he has been rejected. She asserted changing, as a parent, takes significant parental self-control. Still, Dr. Thomas testified that counseling could assist in resolving the relationship disconnects between the child and mother.

{¶24} Dr. Thomas testified that, in her professional opinion, mother "may be inclined to have a greater capacity" to accept counseling. Counseling would help afford her personal insight into building a relationship with W.H. Father, on the other hand, essentially refused to accept that his parenting strategies and comportment with W.H. were potentially problematic. Dr. Thomas testified that when she suggested father consider counseling, he "was like, who, me? There wasn't a lot of insight that he even needed any counseling. And without that insight, it's hard to engage people."

{¶25} With respect to the GAL's testimony and recommendations, we first point out that appellant contends the trial court erroneously permitted the GAL to testify to hearsay statements of third parties. This court has held, however, that the reports of court-appointed investigators, including GALs, may be considered as evidence even though they contain hearsay statements provided that the investigator is available for cross-examination by the parties and that there is not exclusive reliance on such

10

statements. *Ruiz v. Musa*, 11th Dist. Lake No. 2021-L-088, 2022-Ohio-1720, ¶15, citing *Degrant v. Degrant*, 11th Dist. Geauga Nos. 2019-G-0190 and 2019-G-0216, 2020-Ohio-70, ¶34. The GAL was cross-examined and there is no evidence that the trial court relied only on hearsay statements. In this respect, the trial court did not err in considering the GAL's testimony.

{¶26} That said, the GAL testified, inter alia, regarding information gleaned from his interviews with former counselors used by the parties, Kim Lydic and James Vincent. Both counselors advised the GAL that he could no longer see W.H. because they could not assist the child. Mr. Vincent, according to the GAL, stated this case presented "the worst case of parental alienation that I have ever seen, and I have been doing this for 20 years." In light of this, Mr. Vincent emphasized that W.H. required a psychologist who specializes in parental alienation because such a professional is the only individual who could "break the parental alienation and allow [W.H.] to have a normal relationship with his mother."

{¶27} The GAL testified that father appears to act as a "gatekeeper" who defines the relationship, if any, between W.H. and mother. The GAL noted that mother strongly believes father is actively preventing W.H. from having any, let alone a good relationship with her. The GAL determined that the parties cannot cooperate or communicate effectively and, accordingly, shared parenting was inappropriate.

{¶28} In his report, the GAL observed:

{¶29} "It is of critical importance, and is in the best interest of the minor child, for this divorce case to proceed to trial as scheduled * * *. [S]ince the trial was continued * * *, the minor child acting belligerent and disrespectful toward Mother has accelerated. Also

11

Case No. 2021-T-0031

* * *, Father has become more brazen in his actions toward Mother, by regularly denying Mother her parenting time, unilaterally informing Hubbard Middle School that this Court has awarded Father full custody of the minor child, falsely accusing Mother of deliberately shutting off the water and electricity for the marital home, and sending Mother long babbling texts accusing Mother of walking out on her son.

{¶30} "This [GAL] is concerned that Father will attempt to again have the trial continued * * *. As Father has been using the alleged illnesses of the minor child as an excuse to deny Mother her parenting time, Father may claim [on the date of trial] that the minor child is sick, or has a fever, or has frostbite, and the Father cannot come to Court because he is the only person who has the ability to care for the minor child.

{¶31} "The longer this case goes on, the stronger the parental alienation by Father of the minor child will become."

{¶32} Given the statutory best-interest factors, the GAL recommended the following: "That the mother be named the residential parent for all purposes, including being the residential parent for school purposes, for extracurricular activities and for medical decisions. That father's parenting time should be limited to supervised visitation at the Solace Center once a week for two hours.

{¶33} In light of the foregoing, the trial court, after considering the best-interest factors pursuant to R.C. 3109.04(F)(1), made the following findings and conclusions:

{¶34} "[T]he court has heard testimony that can be summed up as the father having nothing but a manipulative and destructive parenting style that will have lasting and detrimental effects on the minor child. The child has been through counseling * * *. The court has also taken into consideration the testimony and the report of Dr. Aimee

12

Case No. 2021-T-0031

Thomas who conducted psychological evaluations with parenting emphasis as well as the numerous Guardian Ad Litem reports.

{¶35} "The court finds, based on the weight and preponderance of the evidence, that it is in the best interest that the allocation of parental rights and responsibilities for the minor child, [W.H.] be designated to * * * mother and she shall be designated residential parent and legal custodian of the parties' minor child. * * * Father will be granted supervised visitation for one (1) hour every week at the Solace Center.

{¶36} "* * * Father may petition this court for expanded visitation upon showing he has entered into counseling to alleviate his alienating behavior and improve his ability to co-parent the parties' minor child."

{¶37} This case is not simple. Father and W.H. clearly have a strong bond. Mother, however, in light of the evidence, has been effectively shut out of the child's life by father's apparent need to control parental influence and parenting dynamics. Even worse, father's strategy has made mother an adversary and an object of scorn in the eyes of the young child. It would appear neither party has "clean hands." Both parents contributed to the way in which this case unfolded. Still, the attempt to alienate W.H. was not mutual; rather, the evidence indicates father, not mother, initiated and succeeded in turning the child against mother. Moreover, the evidence demonstrated that father, not mother, was reluctant to and sometimes simply did not facilitate mother's visitation. Under the circumstances, we therefore hold, the trial court did not abuse its discretion in conferring residential-parent status upon mother.

{¶38} Father's first assignment of error lacks merit.

{¶39} His second assignment of error provides:

13

{¶40} "The trial court's decision to grant weekly supervised visitation between the child and appellant constituted an abuse of the trial court's discretion and was against the manifest weight of the evidence."

{¶41} Father argues, similar to his previous argument, the trial court erred in ordering weekly, supervised custody. He maintains the uncontroverted, strong bond he shares with W.H. demonstrates the order is not in the child's best interest. Further, father takes great issue with the trial court's ostensible reliance on the GAL's testimony, which involved hearsay statements made by counselors who had previously been involved in the case, i.e., Mr. Vincent and Ms. Lydic. He claims Sup. R. 48, governing GALs, never intended for the hearsay testimony to dictate a trial court's decision on custody or visitation.

{¶42} Regarding father's challenge to the GAL's testimony, we first note that there is nothing in the judgment to suggest that the trial court relied solely on the GAL's hearsay testimony in reaching its legal conclusions on either the custody or visitation issues. As quoted above, the court considered the entirety of the evidence, including, but not limited to the GAL's testimony and recommendations.

{¶43} Furthermore, as discussed above, the court was permitted to consider the GAL's hearsay statements to the extent he was subject to cross-examination and the court did not exclusively rely on such statements. In this case, the GAL's final report was admitted as a "court exhibit" and no specific objections to its admission were advanced by the parties. Moreover, the GAL's testimony reflected the information conveyed in the report and he was subjected to rigorous examination from the parties as well as W.H.'s attorney. As just noted, the trial court did not rely exclusively on the GAL's report in

14

drawing its legal conclusions. We therefore discern no error in the trial court's consideration of the GAL's report or his testimony.

{¶44} We shall now consider the visitation order. With respect to our standard of review, "we presume a trial court's order of visitation is correct and reverse only upon a showing of an abuse of discretion." *Wren*, *supra*, at ¶8.

{¶45} As discussed above, and notwithstanding the positive relationship father has with W.H., father's actions served to negate the positive bond mother claimed she had with the child before she filed the second divorce action. And the evidence suggested that if father had unsupervised visitation, he would continue the pattern of conduct that led to or caused the parental alienation alluded to in the GAL's testimony. Dr. Thomas' report and testimony highlighted the need for mother to be much more involved in activities with W.H. that *do not* involve father. And, under the circumstances, given father's persistent, disparaging behavior toward mother, the custody order, while drastic, was designed to serve W.H.'s best, long-term interests.

{¶46} It is apparent the trial court's judgment was gauged to facilitate mending mother's and W.H.'s relationship. Moreover, the judgment allowed for father to move the court for a less restrictive visitation schedule if father submitted to counseling and demonstrated progress with some of the problematic attitudes and/or parenting strategies identified by Dr. Thomas as well as the GAL. In light of the evidence, we conclude the trial court's judgment is consistent with the weight of the evidence.

{¶47} Father is on notice of the court's concerns as well as what he could do to ameliorate them. Father holds the key to unlock the possibility of expanded and more normalized visitation. He must, however, be willing to acknowledge he needs greater

15

Case No. 2021-T-0031

insight into his currently one-sided and self-serving view on parenting the parties' child. To do this, he must also be willing to work with third parties to help achieve this insight. If he is able to do so, the trial court left open the possibility to warrant a more open and flexible visitation order. Given the foregoing, we hold the trial court did not abuse its discretion in issuing its visitation order.

{¶48} Father's second assignment of error lacks merit.

{¶49} Father's third assigned error asserts:

{¶50} "The trial court committed reversible error by permitting the guardian in this case to remain on the case then relying upon his testimony in making its [decision] concerning custody and visitation."

{¶51} Father contends the trial court erred by permitting the GAL to remain on the case because the GAL "had not seen [father] for nearly two years prior to trial." Father alleges the GAL sought an order prohibiting him from directly communicating with father. Father maintains the GAL's actions and inactions inhibited the GAL's abilities to effectively advise the court and undermined his duties as a matter of law.

{¶52} Ordinarily, a trial court's decision concerning the appointment or removal of guardian ad litem as well as their fees is reviewed only for an abuse of discretion. *Meyers v. Hendrich,* 11th Dist. Portage No. 2009-P-0032, 2010-Ohio-4433, ¶21. Where, however, no objection to the GAL's participation in the case or motion to remove is filed, a court must review the case for plain error. *See Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997); *see also Burns v. Burns,* 6th Dist. Sandusky No. S-07-019, 2008-Ohio-2483, ¶15. In the civil realm, the doctrine of plain error is limited to exceptionally rare

16

Case No. 2021-T-0031

cases in which the error, left unobjected to at the trial court, "rises to the level of challenging the legitimacy of the underlying judicial process itself." *Goldfuss*, *supra.*

{¶53} In this matter, the record does not reflect father sought the GAL's removal. In this respect, it is difficult to see how the trial court committed any error in allowing the GAL to remain on the case. That is, without a formal motion to remove the GAL, the court was permitted to presume regularity in the GAL's execution of his duties, even if it was aware of certain tensions between father and the GAL. Regardless of this point, we decline to find plain error.

{¶54} According to the GAL, father had accused the GAL of being biased and discriminating against him. On November 28, 2019, the GAL testified father sent him an email indicating that father and W.H. were being treated unfairly and being discriminated against. Later, on January 27, 2020, father sent the GAL an email stating that the GAL was biased in favor of mother and was discriminatory towards father.

{¶55} At trial, the GAL testified his last interview with W.H. occurred in the Hubbard Middle School in February 2020, approximately 10 months prior to the commencement of trial. The GAL stated that, on February 13, 2020, father sent him an email stating the GAL "[has] now become a hazard to my son and myself. [The GAL's] ethics, professionalism, and morals have become questionable in the safety of my son and myself." The GAL testified this was the reason he did not interview the child after that point.

{¶56} In the same email, the GAL testified the father warned him that "if I see you or your witness on my property, I'll have you and your witness arrested for trespassing." The witness to whom father is referring is an unknown third party who the GAL sought to

17

accompany him during interviews. In effect, it would appear the GAL thought it may be appropriate for a disinterested third-party to attend interviews with father to be a witness in the event father made additional allegations against the GAL.

{¶57} Father does not offer any basis for his assertion of bias against the GAL. And father's contention that the GAL had no contact with him for two years prior to trial is not supported by testimony. The GAL testified his last contact with father was on February 13, 2020 – the date father sent the somewhat hostile email to the GAL. Regardless, given the nature of father's posture toward the GAL, it is unclear how additional communications would have been productive in relation to the GAL's role in the case. In light of the available evidence, we do not view this case as presenting error rising to "the level of challenging the legitimacy of the underlying judicial process." We therefore find no plain error.

{¶58} Father's third assignment of error lacks merit.

{¶59} His fourth assignment of error provides:

{¶60} "The trial court erred and abused its discretion by ordering appellee to pay appellant the sum of $1,000 per month spousal support, for [a] period of six months."

{¶61} Father contends that although the trial court considered the statutory factors relating to spousal support, it unfairly awarded him only $1,000 per month spousal support for six months. He observes that mother's actual net income, $76,715 is nearly $60,000 higher than the income the court imputed to him, $18,000.

{¶62} "The trial court has significant discretion in awarding spousal support in a domestic relations proceeding, provided the award is 'appropriate and reasonable.'" *Bandish v. Bandish*, 11th Dist. Geauga No. 2002-G-2489, 2004-Ohio-3544.

18

{¶63} R.C. 3105.18(C)(1) sets forth various factors a trial court must consider in rendering a decision concerning spousal support. Father does not dispute the trial court considered the factors. In ordering spousal support, the trial court emphasized that "[mother] has been paying the marital expenses for the duration of the case and the court has factored those expenses into its decision. The court has also considered the fact that [mother] agreed to take on all remaining marital debt."

{¶64} With these points in mind, it bears pointing out that father, as of the time of trial, had not worked in nine years. While he asserted his lack of employment was due to an arm injury during his previous employment driving truck, he is in good physical health and did not testify he is incapable of working. He was not actively seeking employment at the time of the final hearing. He maintained, however, his "job" was raising, teaching, and training W.H. Father testified he has an associates' degree in accounting and has a certificate of cosmetology. In light of the foregoing, as well as the fact that the court granted mother custody of W.H., we conclude, as the trial court concluded, father should be able to find employment to support himself.

{¶65} While mother's earnings are much higher than those imputed to father, if father finds employment that disparity will assuredly change. The trial court's spousal support order, while not significant, could be viewed as an impetus for father to be more active in seeking employment. In light of the facts of the case and that father is clearly able to obtain employment, we hold the trial court's spousal support order is appropriate and reasonable.

{¶66} Father's fourth assignment of error lacks merit.

{¶67} Father's fifth assignment of error alleges:

19

**{¶68}** "The trial court committed reversible error by limiting the child's court-appointed attorney to ask questions which involved the best interests of the child."

**{¶69}** Father argues the trial court committed error by limiting the scope of questions W.H.'s appointed attorney could ask. He maintains circumscribing W.H.'s appointed counsel to inquiring into the child's best interests was error.

**{¶70}** Initially, custody was the primary issue vis-à-vis W.H. As such, the child's best interest was the court's principal concern. It is unclear how the trial court's purported limitation of questioning undermined the proceedings or in any way hamstrung father's ability to present his case. Father was represented by counsel and was able to explore all matters germane to his interests as well as W.H.'s potential interests. Even if, as father claims, the court somehow erred in limiting counsel for W.H. to inquiries into the child's best interest, we fail to see how father was in any way prejudiced.

**{¶71}** Furthermore, it is not entirely clear that father has standing to assert error regarding the court's decision to allegedly limit the scope of questioning of *W.H.'s attorney*. There was no objection to the alleged limitation and the court did not limit the scope of questioning of his counsel. To the extent father has failed to set forth some stake or interest in the scope of the inquiries of W.H.'s attorney, he has not established a foundation to challenge the court's action as it relates to W.H.'s attorney.

**{¶72}** Father's fifth assignment of error lacks merit.

**{¶73}** Father's final assignment of error provides:

**{¶74}** "The trial court erred in ordering that appellee receive possession of the marital residence during the time that it is being sold."

20

{¶75} The trial court ordered that the marital residence be sold and the proceeds divided evenly. Mother was granted custody of W.H. and, as a result, mother was permitted to reside in the marital home during the pendency of the sale. Mother notes that the house has been sold. Father did not file a reply brief disputing this point. In this respect, the issue raised by father is moot. And, in any event, father fails to argue how the trial court's decision on this point prejudiced him. We discern no error.

{¶76} Father's final assignment of error lacks merit.

{¶77} For the reasons discussed in this opinion, the judgment of the Trumbull County Court of Common Pleas, Domestic Relations Division, is affirmed.

JOHN J. EKLUND, J., concurs,

MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.
_____

MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.

{¶78} I concur with the majority's disposition of the first, third, fourth, and fifth assignments of error given the highly deferential abuse of discretion standard this court must apply in determining issues of custody and the existence of testimony to support the lower court's decision. I dissent, however, from the majority's disposition of the second assignment of error in upholding the trial court's limited visitation order between the father and W.H. The impact of this decision on the life of the child in this matter cannot be overstated. As will be more fully discussed below, this outcome takes a young child from a parent with whom he has had a strong and consistent bond throughout his life and abruptly all but terminates that relationship. It does so in the absence of abuse to the

21

Case No. 2021-T-0031

child, where the father consistently acted to further his child's interests, was fully involved in his life, and was completely against the child's wishes. Since the record fails to demonstrate a reasonable justification for limiting the father's visitation so drastically, this court should reverse the visitation order.

{¶79} Pursuant to R.C. 3109.051(A), a trial court must make "a just and reasonable order" as to visitation/parenting time unless it determines it would not be in the best interest of the child for the non-residential parent to have parenting time. "Whenever possible, the order or decree permitting the parenting time shall ensure the opportunity for both parents to have *frequent and continuing contact with the child*, unless frequent and continuing contact by either parent with the child would not be in the best interest of the child." (Emphasis added.) *Id.*

{¶80} Given the facts of this case, an award of visitation limited to one supervised hour per week is not just or reasonable. W.H. and his father have a very strong bond and father has consistently been supportive of his son in all of his endeavors, from schooling to sporting activities. Despite difficulties surrounding the divorce proceedings, W.H. has maintained strong grades and participation in his activities. There are no allegations that father has been abusive to W.H. or caused him harm. By all accounts, father has taken his obligation to parent his child very seriously. Significantly, W.H. clearly and unequivocally expressed his wishes to remain in his father's custody. Further, W.H. indicated that he did not get along with his mother and expressed concerns about her failure to spend time with him.

{¶81} The lower court's determination to limit father's custody so drastically is based upon a belief that the father has interfered with or inhibited W.H. and his mother's

22

relationship. Even presuming that to be the case, this would not justify the decision to limit father's visitation so drastically. Prohibiting a child who is clearly attached to his father from visiting with him alters his life in such a significant manner that it raises real concerns for his well-being, all but completely cutting off the most important and significant relationship in his life. The custody arrangement and visitation schedule results in an outcome that trades W.H.'s relationship with one parent with the other one. Sweeping changes in W.H.'s day-to-day life should not be imposed in the hope that a drastic change in custody and visitation will create a stronger bond with one parent. The goal of encouraging a stronger bond, and allowing the mother to be more involved in activities without the father as the majority observes is necessary, can be accomplished while still allowing a reasonable amount of visitation to the father.

{¶82} Courts have been critical of orders limiting parenting time or visitation to this extent, particularly when it results in a significant change for the child. For example, in *Barker v. Barker*, 6th Dist. Lucas No. L-00-1346, 2001 WL 477267 (May 4, 2001), the trial court limited the father's parenting time after he had been involved in confrontations and arguments with the mother in front of their child, limiting visitation until father successfully completed counseling. *Id.* at *2. The court of appeals determined that, while "it is clear that the parties need to resolve the residual issues between them in order to help their daughter resolve her own issues," since the child is "emotionally attached to both parents, has anxiety about losing either of them and is upset by even minor changes, it is unreasonable to suddenly cut off contact with appellant." *Id.* at *5. In *In re D.M.*, 8th Dist. Cuyahoga No. 87723, 2006-Ohio-6191, the court found a parenting time schedule was not in the best interest of the child where, among other things, it did not "adequately

23

address the prior close interaction of the mother and child," and "does not adequately facilitate a relationship between" them. *Id.* at ¶ 57. Similarly here, a sudden decrease in contact occurred and a relationship was not adequately facilitated with the father. In contrast to these circumstances, such restrictive visitation is often utilized where a child has been abused or is in fear of a parent, factors simply not at issue in the present case. *See Bodine v. Bodine*, 38 Ohio App.3d 173, 175-176, 528 N.E.2d 973 (10th Dist.1988) (father had a violent temper and children were afraid of him); *Syslo v. Syslo*, 6th Dist. Lucas No. L-01-1273, 2002-Ohio-5205, ¶ 54 (parent's behavior was "distressing" to the child).

{¶83} It bears repeating that visitation orders must be based on the best interests of the child. R.C. 3109.051(A). A visitation order cannot be based on the mother's personal desire to improve her relationship with her son. It should be observed that of those factors to be considered in ordering visitation under R.C. 3109.051(D), the vast majority favor a reasonable award of parenting time beyond what was given to this father. The prior interaction of the child with his father; the geographical location of the parents and their availability; the age of W.H., his present adjustment to his life, and his wishes; the parties' health; and the lack of any abuse toward the child all weigh in favor of increased visitation.

{¶84} While the child's wishes are not the sole determining factor of an award of parenting time, W.H. could not have more clearly conveyed his desire to spend time with his father and also his desire not to be placed with his mother. If W.H. does not feel a strong bond or relationship with his mother, the courts should not force such a relationship on him by all but terminating, for whatever period of time, his relationship with his father.

24

When a child is safe, healthy, happy, and excelling in his school and sports activities, flipping his life upside down is not just or reasonable.

{¶85} As justification for the drastic limits on the father's visitation, the majority underlines his "persistent, disparaging behavior toward mother." Specific instances of such disparaging behavior, at least in relation to actions taken in the child's presence, however, are in short supply. Father's general demeanor or failure to get along with mother are not reasons to deprive him of custody. It is accurate that the GAL indicated that multiple therapists, who did not testify, observed the father was "alienating" the mother. However, because this was presented only indirectly through the GAL's testimony, it is difficult to determine precisely what actions constituted "disparaging" behavior or alienation, particularly of a significance to justify the extreme limits on visitation ordered in this case.

{¶86} Comments throughout the record that father wanted his son to perform well in sports and encouraged him to succeed, even if interpreted as being motivated by father's past desire to be successful in his own endeavors, hardly justify denial of visitation. Differing parenting styles, to the extent that they do not cause harm to the child, should not be a basis for a disparate order of time with a child. The father, who has consistently and unquestionably always been present in his son's life and provided him with opportunities and support, is now being granted equal or less parenting time than parents who have had their children removed from the home due to dangers such as drug use. While the majority contends that the father needs insight into his one-sided view on parenting, it should be questioned to what extent parenting between two contentious parties to a divorce can be micromanaged by the courts. While it is ideal that separated

25

parents will always work together for the benefit of their children, this is frequently not the case in a contentious divorce. It should not follow that one parent will lose the right to have unsupervised and substantial visitation simply because the parents do not get along.

{¶87} Finally, while the majority emphasizes that the father holds the keys to increased visitation by completing counseling, this does not justify the initial and continued denial of visitation. It is unknown how long his visitation with his son will be limited and what change in his behavior will be acceptable to increase this visitation. Limiting visitation until such time as father conforms to a parenting style approved by others is not a valid reason to restrict his visitation to one supervised hour per week. The order is presently unjust, regardless of additional parenting time he may receive in the future.

{¶88} Given that the trial court's extreme limitation of the father's visitation with W.H. is unjust and unreasonable, it constitutes an abuse of discretion. This matter should be reversed in part for the court to award parenting time consistent with the wishes and best interest of the child to avoid the unnecessary deprivation of a relationship with his father.

Case No. 2021-T-0031